**Harold X (SMITH)**

v.

**William B. ROBINSON, Commissioner, Robert L. Johnson, Ex-Superintendent, Julius T. Cuyler, Superintendent, Robert Wolfe, Administrative Asst., Mr. Creamer, Business Manager, Lou Shemlry, Accountant and Mr. Batdoff, Mail Room Officer.**

Civ. A. No. 76–71.

United States District Court,
E. D. Pennsylvania.

Sept. 6, 1978.

Harold X Smith, pro se.

Margret E. Anderson, Asst. Atty. Gen., Philadelphia, Pa., for defendants.

## OPINION

LUONGO, District Judge.

Plaintiff, a prisoner confined at the State Correctional Institution at Graterford, Pennsylvania, filed this complaint *pro se* on January 23, 1976. He originally sought damages and equitable relief under the Civil Rights Act of 1871, 42 U.S.C. §§ 1983, 1985 (1970), as well as declaratory relief, on four separate claims involving allegedly unlawful acts committed by Graterford officials and allegedly unconstitutional policies adopted by the Pennsylvania Commissioner of Correction. Defendants are the Pennsylvania Commissioner of Correction, the past and present superintendents at Graterford, and the Business Manager and Mail Room Supervisor at Graterford, as well as several lesser officials. I appointed student counsel to represent plaintiff, pursuant to Local Rule 9½, and the parties then engaged in discovery. Defendants later moved for summary judgment, and plaintiff in turn moved for partial summary judgment.

Fed.R.Civ.P. 56. For the reasons hereafter stated, I conclude that plaintiff's motion should be denied, and that defendants are entitled to partial summary judgment.

Although all four of plaintiff's claims are based on events that took place during his confinement at Graterford, the claims are largely unrelated and may be treated separately for the sake of convenience.

### RESTRICTION ON INMATE BANKING

Plaintiff's principal contention here involves a policy adopted in January of 1972 by then-Commissioner Sielaff of the Pennsylvania Bureau of Correction and enforced by defendant Robinson up until April of 1978. This policy, as set forth in written memoranda to all Pennsylvania prison superintendents, prohibited inmates from opening outside savings accounts. It provided, however, that an inmate who already had an active savings account at the time he was incarcerated would be permitted to "retain it for deposit of regularly received income such as checks from Veterans Administration, Social Security, Pension, etc." Sielaff Memorandum, Exhibit X to Complaint; see Robinson Memorandum, Exhibit A to Defendants' Motion for Summary Judgment (Document No. 24).

Although plaintiff already had an active savings account with the Fidelity Bank when he entered Graterford in August of 1973, defendant Johnson refused to permit use of this account because plaintiff had opened it under the name of William H. Bradford, an alias, rather than under Harold Smith, which was plaintiff's name at the time he was incarcerated. Plaintiff was discharged from Graterford on April 5, 1974. When he later attempted to change the name on the account to "Harold Smith," the bank book was lost in the mail. As a result, this account was closed and settled to the satisfaction of all concerned. Complaint ¶ 14.

In June and July of 1975, while again confined at Graterford, plaintiff opened an outside savings account with the Philadelphia Saving Fund Society by mailing in a one-dollar deposit. Complaint ¶¶ 15–16.

Graterford officials evidently raised no objection to the transaction. However, when he sought in November of 1975 to deposit another forty dollars in that account, defendants refused to process this transaction, stating that use of the new account was prohibited by the banking policy referred to earlier.

The complaint asserts that defendants' enforcement of this policy violated several constitutional provisions, particularly the due process and equal protection clauses of the fourteenth amendment. Although the complaint requests declaratory and injunctive relief, plaintiff's counsel has since conceded that these requests are moot in light of Commissioner Robinson's memorandum of April 8, 1978, which permits all inmates to establish and maintain outside savings accounts. Plaintiff's Supplemental Memorandum (Document No. 48) at 1; see Robinson Memorandum, Exhibit I to Defendants' Supplemental Memorandum (Document No. 47). Thus, only plaintiff's damages claim remains for adjudication. Both plaintiff and defendants seek summary judgment on this claim.

Plaintiff argues, first of all, that defendants' refusal to let him use an outside savings account deprived him of property without due process of law. His argument calls attention to defendants' overall management of money earned or received by Graterford inmates. It is undisputed that such moneys are credited to the inmate's "intra-institutional account," and then pooled into the Inmate Cash Fund. Cramer Affidavit ¶¶ 7–9, 20 (Exhibit A to Defendants' Motion for Summary Judgment). The bulk of each institution's Inmate Cash Fund is sent to the Bureau of Correction, which in turn pools those moneys (together with other moneys not pertinent here) into the General Welfare Fund. Id. ¶¶ 21–22, 24. Finally, the Bureau invests all moneys contained in the General Welfare Fund, "and the interest earned is used solely for the benefit of all inmates in all State Correctional Institutions for such things as movies, recreational supplies, television, etc." Id. ¶ 25.

Plaintiff's objection to this arrangement stems from the fact that inmates' "intra-institutional accounts" do not bear interest. *Id.* ¶ 8. He contends here that defendants, by failing to pay interest on the money in his account, by placing his money in the General Welfare Fund, and by appropriating the interest earned on his money through investment of the General Welfare Fund, effectively deprived him of property without due process of law.

Although defendants contend that their actions did not violate plaintiff's constitutional rights, they rely primarily on the affirmative defense of qualified, "good faith" immunity. *See generally Butz v. Economou,* 438 U.S. ——, ——, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978); *Procunier v. Navarette,* 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978); *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975); *Developments in the Law—Section 1983 and Federalism,* 90 Harv.L.Rev. 1133, 1209–17 (1977); *The Supreme Court, 1974 Term,* 89 Harv.L.Rev. 47, 219–25 (1975). *Procunier v. Navarette, supra,* establishes beyond question that "prison officials and officers" enjoy qualified immunity from damages liability under the Civil Rights Act of 1871. 434 U.S. at 561, 98 S.Ct. 855 (addressing claims based on 42 U.S.C. § 1983); *see Raitport v. Provident Nat'l Bank,* 451 F.Supp. 522, 534 (E.D.Pa.1978) ("sections 1983 and 1985 require identical analyses where immunity is asserted"). The critical question here is whether, by reason of this defense, defendants are entitled to judgment as a matter of law on plaintiff's damages claim. I conclude that they are.

Under *Wood v. Strickland, supra,* an official who enjoys qualified immunity may nevertheless be held liable for damages "if [he] knew or reasonably should have known that the action he took within the sphere of his official responsibility would violate the constitutional rights of the [individual] affected, *or* if [he] took the action with the malicious intention to cause a deprivation of constitutional rights or other injury to [that individual]." 420 U.S. at 307, 95 S.Ct. at 994 (emphasis supplied). Although the complaint here fairly alleges that defendants' conduct was *intentional, Procunier v. Navarette, supra,* 434 U.S. at 566, 98 S.Ct. 855, plaintiff has neither alleged nor shown by affidavit that their conduct was *malicious.* Accordingly, the second branch of the *Wood v. Strickland* standard cannot override defendants' claim of qualified immunity, *Butz v. Economou,* 438 U.S. ——, ——, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), and only the first branch is applicable here.

The Supreme Court restated that portion of the standard only recently in *Procunier v. Navarette, supra* :

> "Under the first part of the *Wood v. Strickland* rule, the immunity defense would be unavailable to [defendant prison officials] if the constitutional right allegedly infringed by them was clearly established at the time of their challenged conduct, if they knew or should have known of that right and if they knew or should have known that their conduct violated the constitutional norm."

434 U.S. at 562, 98 S.Ct. at 860.

Application of that standard here requires that I determine whether, at any time between January of 1972 and April of 1978, state prisoners enjoyed a clearly-established due process right to earn interest on moneys received while incarcerated. If no such clearly-established right existed during the relevant time period, then I need not go on to determine (a) whether defendants knew or should have known of that right, or (b) whether defendants knew or should have known that their conduct infringed upon that right. *See Procunier v. Navarette, supra,* 434 U.S. at 565, 98 S.Ct. 855.

The inquiry here is hampered by plaintiff's failure to articulate clearly the nature of his due process claim. Plaintiff's memorandum of law could be interpreted to assert (1) a procedural due process claim, (2) a substantive due process claim, (3) a claim based on the takings clause of the fifth amendment, as incorporated into the due process clause of the fourteenth amendment, *see, e. g., Penn Central Transporta-*

*tion Co. v. City of New York,* —— U.S. ——, ——, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), or (4) some combination of these theories. *See generally Holder v. Nelson,* 514 F.2d 1091, 1091 n.2 (9th Cir. 1975) (per curiam).

Whichever theory is adopted, however, neither the cases cited by plaintiff nor the other decisions that address this issue can support a claim that state prisoners, during the six-year period in question, enjoyed a well-settled constitutional right to earn interest. *Sell v. Parratt,* 548 F.2d 753 (8th Cir. 1977), held only that prison officials could not permanently confiscate currency in a prisoner's possession to punish him for violating a prison regulation barring inmates from possessing currency. The due process violation in *Sell* was clearly identified by the court: the Nebraska Department of Correctional Services exceeded its statutory authority by promulgating the regulation that authorized such forfeitures of currency as a means of punishment. 548 F.2d at 759. In sharp contrast, the "missing" interest here never came into plaintiff's possession, and so was not confiscated; moreover, the banking policy formerly enforced at Graterford was not punitive in nature, and plaintiff has never contended that the Commissioner of Correction lacked statutory authority to adopt it.

*Holder v. Nelson,* 514 F.2d 1091 (9th Cir. 1975) (per curiam), the other court of appeals decision relied on by plaintiff, is also of little help. Plaintiffs in *Holder* sought to enjoin as unconstitutional the operation of a California statute that (apparently) authorized prison officials to deposit into an Inmates' Welfare Fund "interest earned on inmates' savings accounts held in trust under Cal. Penal Code § 5008." 514 F.2d at 1091. The district court dismissed the complaint for failure to state a claim, and the court of appeals reversed, holding that the claims asserted presented a substantial federal question and so required convocation of a three-judge court. 514 F.2d at 1092. Plaintiff argues that the *Holder* court found this "taking" of inmates' accrued interest "to be sufficient to constitute a deprivation of property without due process of

law in violation of the Fourteenth Amendment." To the extent that this argument interprets *Holder* as a decision on the *merits* of such a claim, it is obviously ill-founded.

*Douglas v. Ward,* 77 Civ. 2559 (S.D.N.Y. Aug. 30, 1977) (Frankel, J.), the most recent district court authority relied on by plaintiff, is a terse, unpublished interim order denying defendants' motion to dismiss the complaint. The pertinent part of Judge Frankel's order reads as follows:

"[P]laintiffs' case is substantial enough (under the Equal Protection and Due Process Clauses) to withstand dismissal at this stage. As of now, the court is not enlightened by defendants as to any supposedly rational reason for depriving inmates of interest on savings and depriving poor inmates more utterly than others."

Assuming for the moment that Judge Frankel was referring to a policy similar to the one formerly enforced at Graterford, his order plainly does not hold that such a policy violated anyone's constitutional rights. Rather it simply concludes that the constitutional claims were not so frivolous as to warrant dismissal. The order thus cannot be read to suggest the existence of any well-established constitutional right, even as recently as August of 1977, and the *Douglas* litigation has not yet been resolved on the merits.

Plaintiff also relies on *Fayerweather v. Wainwright,* TCA 75–3 (N.D.Fla. Aug. 20, 1976), Pov.L.Rep. (CCH) ¶ 23,325. *Fayerweather* presented facts virtually identical to the facts in this case. The Florida prison officials sued in *Fayerweather* had (1) denied inmates the right to use outside savings accounts, (2) refused to pay interest on moneys deposited in the inmates' prison accounts, (3) pooled and invested all such moneys, and (4) placed the interest earned thereon, in a general Welfare Trust Fund to be expended for the benefit of all inmates. *See Fayerweather v. Wainwright,* TCA 75–3 (N.D.Fla. Nov. 8, 1977) (order approving class settlement agreement).

Judge Stafford of the Northern District of Florida certified a class of inmate plaintiffs and, in the unpublished order relied on by plaintiff, granted plaintiffs' motion for partial summary judgment. The pertinent portion of Judge Stafford's order states:

"The Court is of the opinion that plaintiffs' motion for partial summary judgment should be granted. There has been no showing that the exclusion of inmates from establishing personal interest-bearing savings accounts in some form from monies received by them at state penal institutions is rationally related to any legitimate state goal regarding the confinement or rehabilitation of the inmates. Nor does the record show that the policy is even rationally related to an objective of reducing administrative burdens in handling inmates' finances. Defendants currently maintain inmate accounts. The record keeping involved in assigning interest pro-rata to inmates from such an account would not be burdensome to the extent that it would justify the extreme measures taken here. The nonconsensual taking of interest [derived] from an inmate's account and placing of it in a general welfare fund to be expended for the benefit of other prisoners as well as employees of the prison is clearly a taking of property without due process of law and violates equal protection."

*Fayerweather v. Wainwright,* TCA 75–3, order at 2 (N.D.Fla. Aug. 20, 1976).

Although Judge Stafford recognized the very constitutional rights asserted here by plaintiff, a lone unpublished district court order simply cannot support a finding that those rights were clearly established as of the date it was issued (August 20, 1976), much less at any earlier date.

Also deserving of mention are *Bijeol v. Benson,* 404 F.Supp. 595, 599 (S.D.Ind.1975) (federal prisoner has no "constitutional right to draw interest on his commissary account") (alternative holding), and an earlier district court decision holding that the alleged refusal to permit maintenance of a savings account did not "rise to constitutional dimensions." *Collins v. Haga,* 373 F.Supp. 923, 926 (W.D.Va.1974). *Cf. Kim-*

*ble v. State of Michigan Correction Dept.,* 300 F.Supp. 1122 (E.D.Mich.1968), *aff'd per curiam on opinion of lower court,* 411 F.2d 990 (6th Cir. 1969) (confiscation of currency possessed by state prisoner in violation of prison regulations held not actionable under section 1983). *See also Urbano v. Board of Managers,* 415 F.2d 247 (3d Cir. 1969), *cert. denied,* 397 U.S. 948, 90 S.Ct. 967, 25 L.Ed.2d 128 (1970).

My review of the pertinent authorities on this question leaves no doubt that the courts have yet to recognize a well-settled right, under any aspect of the due process clause, to earn interest on moneys received while incarcerated. Under the circumstances, the "clearly established right" aspect of *Wood v. Strickland* is unavailing to plaintiff here, and defendants' assertion of qualified immunity must therefore prevail. Accordingly, defendants are entitled to summary judgment on plaintiff's due process claim based on enforcement of the policy regarding outside savings accounts.

Plaintiff also contends, however, that the policy formerly enforced at Graterford violates the equal protection clause. The argument, as formulated while that policy was still in effect, runs as follows:

"The banking regulation . . . distinguishes between an inmate who has an active outside savings account when he enters Graterford and an inmate who does not. The inmate with an active outside savings account upon admission . . . is permitted to maintain his account, and thus allowed to earn interest on his money. The inmate without an active outside savings account upon admission . . . is not permitted to open or use such an account. . . . This distinction between two classes of inmates results in some inmates earning interest directly on their money and others, such as plaintiff, receiving no interest on their money.

Defendants contend that the banking regulation rationally furthers a legitimate state interest in reducing the administrative burden. An examination of

the handling of inmate finances at Graterford shows that the regulation is both arbitrary and unnecessary. . . . The regulation is not based on the number of inmates who have these accounts, the frequency of disbursements, the amount of money the inmate has in the account, or the length of time the savings account has been open. . . . Whether an inmate earns interest on his money while at Graterford is purely fortuitous." Plaintiff's Memorandum of Law (Doc. No. 44) at 7–8.

With respect to the equal protection claim, however, plaintiff does not even suggest that prior decisions delineate a "clearly established" right that would defeat defendants' assertion of qualified immunity. Under the circumstances, I conclude that defendants are entitled to summary judgment on this aspect of plaintiff's damages claim as well.

Accordingly, summary judgment will be entered for defendants on both aspects of plaintiff's damages claim based on enforcement of the challenged banking policy. Plaintiff's cross-motion for summary judgment on this claim will be denied. I wish to emphasize, however, that this adjudication is necessarily a narrow one. In assessing the law as it stood during the period when the banking policy was in force, I concluded that neither the due process right nor the equal protection right now claimed by plaintiff was then well-settled. I have had no occasion here to consider whether the challenged banking policy, if it were reinstituted, would today be held to violate either the due process clause or the equal protection clause. Rather, my inquiry has been entirely retrospective, for this is what the "clearly established right" aspect of *Wood v. Strickland, supra,* seems to contemplate. See *Procunier v. Navarette, supra,* 434 U.S. at 565, 98 S.Ct. 855.

### DELAYED REPORTS OF TRANSACTIONS ON PLAINTIFF'S "INTRA–INSTITUTIONAL" ACCOUNT

■ Plaintiff's second general claim concerns the allegedly inadequate notice given to inmates when Graterford employees, acting pursuant to inmates' requests, deduct from their "intra-institutional" accounts the cost of postage for outgoing letters or the cost of reproducing legal papers that are being sent out in multiple copies. Plaintiff contends that he receives insufficiently frequent reports of his account balance, and he states in his affidavit that the reports he does receive are incomplete in that authorized expenditures, such as postage fees, are sometimes not reported for two months after the money is actually deducted from the account. Smith Affidavit ¶ 2. Furthermore, plaintiff argues that these deficiencies implicate his first amendment rights.

"Lack of knowledge of the cost of correspondence curtails plaintiff's use of the mails. For example, if plaintiff mails a packet of papers to the court, he does not know the cost to him, sometimes for as long as two months after the postage was issued. Plaintiff is then restrained from sending more letters because he does not know how much money remains in his inmate account. Such restraint by defendants of plaintiff's right to use the mails is a violation of the First Amendment."

Plaintiff's Memorandum of Law (Doc. No. 44) at 13.

The complaint requests injunctive and declaratory relief, as well as an award of damages. Although plaintiff does not seek summary judgment on this claim, he urges that defendants are not entitled to summary judgment "because the completeness of the monthly statement is in dispute." *Id.* 12.

By way of response, defendants point out that each Graterford inmate now receives a monthly account statement that "shows the beginning balance, deposits, withdrawals, expenditures and the ending balance for the month." Cramer Affidavit ¶ 7. Defendants acknowledge that the "tremendous workload" carried by the Inmate Accounting Section at Graterford has led to significant delays in posting withdrawals on inmates' monthly account statements. Rohrbach Affidavit ¶¶ 5–6. They emphasize,

however, that the addition of a new staff member to the Inmate Accounting Section in January of 1978 is expected to reduce these delays "substantially, if not completely." *Id.* ¶¶ 7–9.

Based on these facts, defendants assert that the issues raised by plaintiff "do not rise to constitutional dimensions and do not state a claim for relief" under the Civil Rights Act of 1871. Defendants' Memorandum of Law at 4. With respect to plaintiff's damages claim, moreover, defendants again rely on the affirmative defense of qualified immunity. They seek summary judgment in their favor. I conclude, however, that defendants are not entitled to summary judgment at this time.

█ With respect to the *frequency* of inmate account statements, I am hard-pressed to discern any constitutional deficiency in the practice currently followed at Graterford. Plaintiff does not dispute that such statements are now issued on a monthly basis, and I cannot say that the first amendment requires more than this. Accordingly, plaintiff's request for injunctive relief based on the frequency of inmate account statements is now moot.

On the other hand, I recognize that *incomplete* statements, however frequently they are issued, may significantly hinder inmate correspondence. Depending on the extent of the incompleteness, which is not revealed by the factual record now before me, this aspect of plaintiff's claim may well rise to constitutional dimensions. Moreover, the addition of a staff member to the Inmate Accounting Section at Graterford, while it may suggest that delays in reporting transactions will soon be reduced or eliminated, does not by itself render moot plaintiff's request for injunctive relief from such delays. Any determination of mootness must await submissions by the parties that address the incidence of delays since the new staff person was hired.

It remains to consider plaintiff's claim for damages based on defendants' former practice of providing inadequate notice of deductions from inmate accounts. With respect to this claim, defendants once again assert the affirmative defense of qualified, "good-faith" immunity. I have already held that defendants, by reason of their status as prison officers, may claim the defense of qualified immunity. *See* discussion *supra.* The only question here is whether defendants are thereby entitled to prevail on their motion for summary judgment with respect to the present damages claim. As was the case with plaintiff's previous damages claim, defendants would not be entitled to summary judgment "if the constitutional right allegedly infringed by them was clearly established at the time of their challenged conduct, if they knew or should have known of their right and if they knew or should have known that their conduct violated the constitutional norm." *Procunier v. Navarette, supra,* 434 U.S. at 562, 98 S.Ct. at 860. I cannot resolve those questions at this stage of the litigation, however, as the present record is inadequate. First, the record does not reveal the precise time period during which Graterford inmates were given allegedly inadequate notice of deductions from their accounts. Second, the parties' submissions do not adequately address the state of the law during that time period. Defendants assert that "there is no legal authority for the proposition that the procedures followed [here] were unconstitutional." Defendants' Memorandum of Law (Document No. 24) at 9. Plaintiff, on the other hand, asserts that his rights "were established at the time this action arose and defendants have not shown otherwise." Plaintiff's Memorandum of Law (Document No. 44) at 14. Nowhere do the parties even identify the precise constitutional right at issue here. Thus, defendants' position may be that prisoners enjoyed no "clearly established" first amendment rights at all in their correspondence during the relevant time period, or, more narrowly, that prisoners enjoyed no "clearly established" right to be free from the particular kind of indirect burden on correspondence that is at issue here. With the record in this state, I cannot say that defendants have carried the burden that invariably rests with a party who moves for summary

judgment. The controlling issue here is whether plaintiff may resist summary judgment by reason of the "clearly established right" aspect of *Wood v. Strickland, supra,* and I am unwilling to resolve that issue on the present record. Accordingly, I will deny defendants' motion for summary judgment on this damages claim, without prejudice to their right to renew that motion upon supplementation of the record.

■ Defendants, by reason of their status as public officials, already enjoy the very substantial benefits of qualified immunity from damages liability under 42 U.S.C. § 1983, the general federal civil rights statute. In the wake of *Procunier v. Navarette, supra,* they may also take advantage of summary judgment procedures when asserting the immunity defense. *See, e. g., Butz v. Economou,* 438 U.S. ——, ——, 98 S.Ct. 2894, 2911, 55 L.Ed.2d 24 (1978) ("damage suits concerning constitutional violations . . . can be terminated on a properly supported motion for summary judgment based on the defense of immunity"). Under the circumstances, I believe it is not unduly burdensome to require that such officials, in their written submissions, offer some sustained argument in behalf of their summary judgment motions, rather than simply asserting in a conclusory fashion that they acted in good faith and hence are immune from liability.

### DELAYS OF OUTGOING MAIL

In his complaint, plaintiff alleges that in 1975, defendant Batdorf, the Mailroom Supervisor at Graterford, delayed sending at least ten pieces of plaintiff's outgoing legal mail. Complaint ¶ 26. The ten letters involved are identified by postmark date in plaintiff's answers to interrogatories. *See* Document No. 13, ¶ 39. Plaintiff further alleges that Batdorf "censored" his legal mail, in violation of Graterford policy, and that Batdorf delayed an outgoing letter and accompanying check addressed to plaintiff's mother. *Id.* ¶¶ 26–27. With respect to outgoing mail containing checks, plaintiff alleges that defendants Cramer, Shemery, and Cuyler "are responsible for a policy

that holds up the plaintiff's mail" whenever it contains a check. *Id.* ¶ 28. Based on these facts, which are said to make out violations of the first, sixth, and fourteenth amendments, the complaint requests injunctive and declaratory relief, as well as an award of damages.

Defendants, by way of response, proffer three arguments. With respect to outgoing mail containing checks, defendants acknowledge that "short delays in such mail do sometimes occur," but they assert that such delays do not violate plaintiff's constitutional rights. Defendants Memorandum of Law (Document No. 24) at 8. With respect to outgoing legal mail, on the other hand, defendants contend that plaintiff's claim is barred by a statement made nearly two years ago at a pretrial conference. Finally, with respect to any claim for damages, defendants again rely on the defense of qualified, "good-faith" immunity. Based on these arguments, they seek summary judgment. I conclude, however, that defendants are not entitled to summary judgment at this time.

■ To begin with, summary judgment is plainly unwarranted with respect to the claim involving delay of outgoing checks, for a genuine issue exists as to the extent of such delay. Defendant Batdorf states in his affidavit that such mail is "generally" not delayed, although "sometimes an extra day" is required to process such mail through the Business Office and the Inmate Accounting Section. Batdorf Affidavit ¶¶ 2, 5. On the other hand, plaintiff states that after the commencement of this action, Graterford officials "began delaying all of plaintiff's outgoing mail containing checks for two to three weeks." Plaintiff's Answers to Interrogatories ¶ 48. Until this factual issue is resolved, I simply cannot determine whether plaintiff's constitutional claim is meritorious. Accordingly, defendants are not entitled to summary judgment on this portion of plaintiff's claim.

The same result obtains with respect to the claim based on delays of outgoing legal mail. Defendants' brief does not address the merits of this claim. Instead, it simply

cites the pretrial report and order that I entered on November 1, 1976, which reflects what was at that time a common understanding among the parties and the court—that plaintiff's claim of delays in outgoing mail was limited to mail containing checks, and did not include outgoing legal mail. *See* Pretrial Report and Order (Document No. 15). Now that plaintiff seeks to raise a claim pertaining to delays and censorship of legal mail, defendants rather predictably object on that ground that they "have relied upon [the report and order] as the final statement of the issues." Defendants' Memorandum of Law (Document No. 46) at 4.

Although I recognize that permitting plaintiff to press this claim may entail a measure of "surprise" to defendants, I nevertheless conclude that any other result would be manifestly unjust. To begin with, the claim that defendants seek to bar was set out quite clearly in the complaint, which was filed some two and a half years ago. Secondly, plaintiff has been represented by student counsel since the earliest stages of this litigation. His counsel on November 1, 1976—the date of the pretrial conference—was a law student who has taken no part in the litigation for well over a year now. Finally, more than six months have passed since plaintiff's most recent student counsel filed the motion for partial summary judgment that seeks to "revive" the claim involving legal mail. Taken together, these considerations significantly reduce any unfairness involved in requiring defendants to meet that claim. Accordingly, I will not enter summary judgment for defendants on the claim involving delays—and "censorship"—of outgoing legal mail.

Finally, summary judgment with respect to plaintiff's damages claim is unwarranted at this time. Defendants once again assert qualified, "good-faith" immunity from damages liability. Once again, however, the record contains nothing more than the parties' unsupported assertions regarding the state of the law at the time plaintiff's letters were delayed and/or "censored." I am unable to determine whether defendants argue, on the one hand, that prisoners enjoyed no "clearly established" first amendment right of any kind with respect to their correspondence during the period in question, or, on the other hand, that prisoners simply enjoyed no well-settled right to be free from delays and censorship in corresponding with others. Thus, the controlling issue here—whether plaintiff's rights were "clearly established" at the time of the challenged conduct—is addressed only in a most conclusory fashion. Accordingly, I will deny defendants' motion for summary judgment at this time, without prejudice to their right to renew that motion following supplementation of the record.

## TAKING OF CHECKS "PURCHASED" BY PLAINTIFF

Plaintiff's fourth and last claim arises from the following undisputed facts. At some time in 1975, Anthony S. Pickens, another Graterford inmate, authorized the issuance of two checks drawn on his "intra-institutional" inmate account, each one payable to Mrs. Elanora Smith, who is plaintiff's mother. These checks, each in the amount of fifty dollars, were mailed to Mrs. Smith from Graterford. At about the same time, Robert Walker, also a Graterford inmate, also authorized the issuance of a check drawn on his inmate account. This check, in the amount of ten dollars, also named Mrs. Smith as payee, and also was mailed to her from Graterford. Some time thereafter, Mrs. Smith returned all three checks, unendorsed, in an envelope addressed to plaintiff at Graterford. The envelope also contained a note "telling [plaintiff] to send them to [plaintiff's brother]." Complaint ¶ 21. Pursuant to institutional policy, the checks were removed from the envelope before it was given to plaintiff. Moreover, the amount of each check was automatically credited to the inmate account on which it had been drawn. Graterford officials apparently retained physical possession of the checks.

Based on these events, plaintiff advances the following argument in support of his motion for partial summary judgment:

"Although the checks in question were not made payable to plaintiff, they were forwarded to him by his mother. Clearly the checks, as any other objects mailed to the plaintiff at the institution, were intended for his possession. They were as much his property as any other correspondence from home. By confiscating the checks, the defendants deprived plaintiff of his property without due process of law. Even if the Court were to decide that plaintiff did not have a right to possession of the checks, he clearly had a right to direct that the checks be sent back to his mother. Therefore, [summary] judgment for plaintiff must be entered on this issue."

Plaintiff's Memorandum of Law (Document No. 44) at 10 (citations omitted). As I understand plaintiff's submissions, this claim is solely one for damages; neither declaratory nor injunctive relief is sought here.

Defendants, for their part, reach precisely the opposite result in an equally conclusory fashion. After summarizing the facts as set out above, defendants' brief continues:

"It thus becomes clear that the checks were not the property of plaintiff. Since the checks were returned unendorsed, they could only be credited to the accounts against which they were drawn. [Citation to Cramer Affidavit omitted.] Such a result is clearly not arbitrary or capricious and does not violate a constitutional right of plaintiff. [Citation omitted.]"

Defendants' Memorandum of Law (Document No. 24) at 7. Finally, defendants once again invoke the defense of qualified, "good-faith" immunity from damages liability. Based on these arguments, they seek summary judgment in their favor.

■ As I understand plaintiff's argument, which is reproduced above in its entirety, the confiscation of the three checks, which plaintiff claims were his property,

worked a denial of substantive due process.[1] I believe that even a cursory consideration of that claim reveals it to be without merit.

The crux of plaintiff's due process claim, of course, is that the three checks were, in some sense, his property. It may well be that a state prisoner, by virtue of being named as the addressee on an envelope carried through the United States mails,. acquires a property interest in the contents of that envelope. I need not decide that issue, however. Instead, I will consider plaintiff's due process claim on the assumption that the three checks involved here were, in some sense, his property when they were confiscated by defendants.

As Chief Justice Burger recently observed, "due process analysis properly begins with a discussion of the appropriate standard of review." *Duke Power Co. v. Carolina Environmental Study Group, Inc.,* —— U.S. ——, ——, 98 S.Ct. 2620, 2635, 57 L.Ed.2d 595 (1978). Under the standard traditionally applied in substantive due process cases, challenged state action will not be invalidated "unless the aim it is to achieve is not within the range of legitimate state interests or it is not rationally related to the attainment of a legitimate end." *McKnight v. Southeastern Pa. Transportation Auth.,* 438 F.Supp. 813, 825 (E.D.Pa.1977) (citations omitted); *see, e. g., Exxon Corp. v. Governor of Maryland,* —— U.S. ——, ——, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978). Although a more searching standard of review is applied where the challenged state action infringes upon some "fundamental" liberty, *id.,* plaintiff does not suggest that any such "heightened" scrutiny is appropriate here.

It remains to apply the standard just articulated to the action that is challenged here. Defendants have presented by affidavit evidence that "all checks are removed from letters addressed to [Graterford] inmates before the letters are given to inmates," and that this procedure is followed

---

1. It may be that I have misconstrued the thrust of plaintiff's argument, and that plaintiff actually meant to assert either a procedural due process claim or a takings clause claim. If that

is the case, plaintiff is free to amend his complaint and set out more clearly the nature of his legal claim.

for security reasons. Batdorf Affidavit ¶ 9. Underlying this policy is an awareness that checks, being negotiable, can lead to mischief if left in an inmate's possession. Possession of a negotiable instrument, no less than possession of United States currency, may enable an inmate to purchase contraband from other prisoners or to bribe prison employees. Moreover, the inmate who possesses money, in whatever form, may become the victim of robbery attempts.

In an effort to prevent behavior of this sort, Graterford officials remove all checks contained in incoming inmate mail. Checks made payable *to* an inmate are presented to the inmate for his endorsement, and are then immediately deposited in his "intra-institutional" account. Batdorf Affidavit ¶ 10. However, "[w]hen a check sent *out* by an inmate is returned unendorsed, the amount of the check is automatically restored to his inmate account." *Id.* ¶ 11 (emphasis supplied). That, of course, is what happened here.

Defendants, by confiscating these three checks and crediting the amounts thereof to Pickens' and Walker's accounts, apparently interfered with plaintiff's efforts to send money to his mother. The record does not reveal whether plaintiff ever recovered from Pickens or Walker the money he presumably gave them in exchange for the checks drawn on their accounts. Whatever the facts may be in this regard, it nevertheless is abundantly clear that defendants' conduct here was rationally related to the permissible objective of preserving prison security. That being the case, plaintiff was not deprived of property without due process of law, and defendants are therefore entitled to judgment in their favor as a matter of law.[2] Plaintiff's cross-motion for summary judgment will be denied.

## CONCLUSION

For the reasons set out in this opinion, defendants are entitled to summary judgment on the damages aspect of plaintiff's claim based on the banking policy. The

declaratory and equitable aspects of that claim are now moot. Defendants are also entitled to summary judgment on plaintiff's claim arising out of the confiscation of checks mailed to him. In all other respects, defendants' motion for summary judgment will be denied. Plaintiff's cross-motion for summary judgment will be denied in its entirety.

---

2. In light of this disposition of plaintiff's claim, I need not, and do not, reach defendants' assertion of qualified, "good-faith" immunity in connection with this claim.